IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| A.T. and Q.C., Parents, Individually and on Behalf of Q.C.2, Student,<br><br>  Petitioners,<br><br>v.<br><br>Monroe County Community School Corporation,<br><br>  Respondent. | )<br>)<br>)<br>)<br>)  Case No.: 1:26-cv-00230<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT and DEMAND FOR TRIAL BY JURY**

COME NOW, A.T. and Q.C., Parents Individually ,and on Behalf of Q.C.2 a Student, and do hereby bring this action against Defendant school corporation Monroe County Community School Corporation (hereinafter "Monroe") for damages suffered as a result of discrimination against A.T., Q.C., and their child Q.C.2 on the basis of Q.C.2's disability. Plaintiffs hereby request a trial by jury in this matter.

**INTRODUCTION**

1. This action is brought pursuant to the Fourteenth Amendment of the U.S. Constitution, Section II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, Title VI of the Civil Rights Act, and in tort.

2. A.T., Q.C., and their child Q.C.2. live in Monroe County, Indiana. Monroe is located in Monroe County.

3. Q.C.2, is a qualified individual with a disability and was at all times relevant, a student at Monroe.

4. Monroe is an Indiana public school corporation that receives federal funding for the education of students with disabilities and other services.

5. Monroe discriminated against Q.C.2 on the basis of his disability and as a result, A.T., Q.C. and their child, Q.C.2 have suffered and continue to suffer emotional, pecuniary, and actual damages.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this case pursuant to 28 USC §1331 and §1367, the Fourteenth Amendment, Section 504 of the Rehabilitation Act, and the Americans with Disabilities Act.

7. This Court, without regard to the amount in controversy, has jurisdiction over the Plaintiffs' request pursuant to federal statutes and Indiana statutes.

8. Venue is proper in the Southern District of Indiana, Indianapolis Division, because all of the actions took place in Monroe County. Additionally, the parties lived, resided, attended school, or were incorporated in Monroe County, Indiana when all the relevant action took place.

## PARTIES

9. A.T., Q.C. and their child, Q.C.2 live in Monroe County, Indiana and Q.C.2 has legal residence within the Monroe school boundaries.

10. Q.C.2 is a qualified individual with a disability and his parent(s) are A.T. and Q.C.

11. Monroe is a public-school corporation in Monroe County, Indiana and located at 315 E North Drive, Bloomington, IN 47401.

## FACTS APPLICABLE TO ALL COUNTS

12. Q.C.2 is a ninth-grade student at Batchelor Middle School, within Monroe County Community School Corporation. He is eligible for special education and related services as a student with Autism and Other Health Impairment.

13. Throughout the 2023-2024 and 2024-2025 school years, the School repeatedly disciplined Q.C.2 through in-school suspensions, out-of-school suspensions, behavioral referrals, and removals, for behaviors that were directly related to his disability and exacerbated by peer harassment.

14. Throughout the 2023-2024 and 2024-2025 school years, Q.C.2 has received multiple in-school suspensions, behavioral referrals, and class removals.

15. n or about March 1, 2024, Q.C.2 was issued an in-school suspension for his comments during a class discussion. The class discussion centered around negative thoughts, and Q.C.2 shared that he sometimes thinks about bringing a gun to school, which was in line with the discussion. At that time, Q.C.2 had been bullied by multiple male students, who repeatedly "twerked" on him, called him names in a sexual tone, called him their "wifey,"

and stated they were going to "cream" on him; all of this behavior prompted his comment. Though Q.C.2's teacher did not take it as a threat, he sent Q.C.2 to the office, which assigned him an in-school suspension.

16. On or about March 19, 2024, Q.C.2 was issued an in-school suspension for sending a text to a friend's mother about the friend's grades. Q.C.2 was given the personal information from the friend's girlfriend. The school cited "threatening the parent" as the reason for Q.C.2's suspension because Q.C.2 indicated that he knew their address in the text. The friend knew Q.C.2 had sent the messages, but later denied knowing who sent them when questioned by school staff.

17. On or about April 2, 2024, Q.C.2 received permission to go to the office before the bell rang at breakfast. As he was going to the office, a teacher he didn't know confronted him and asked why he was going, Q.C.2 explained, "only for [the teacher] to accuse [him] of lying." The next day, the teacher confronted Q.C.2 for allegedly lying, which led to his escalating, using explicit language, and throwing pencils. As a result, Q.C.2 received an in-school-suspension.

18. Despite more than ten (10) disciplinary removals by this time, the School failed to schedule a manifestation determination meeting.

19. When A.T. notified the school that Q.C.2 had been suspended over ten (10) times and the manifestation determination meeting that she had previously requested still hadn't been scheduled, the School incorrectly stated

that only out-of-school suspensions counted toward the 10-day threshold, disregarding federal law requiring review when a pattern of removals constitutes a change of placement.

20. During August 2024, Q.C.2 endured racial harassment on the bus, which ultimately escalated into a physical fight with another student. A.T. then requested Q.C.2 be allowed to change buses. The School took a few days, but ultimately switched Q.C.2's bus.

21. On or about September 24, 2024, Q.C.2 received a failing grade on an assignment due to an incident with another student. Q.C.2's partner repeatedly racially harassed him and when reported, the teacher did nothing. A.T. told Q.C.2 to continue to work on the project, while limiting interaction with the other student so it wouldn't affect his grade. As a result, his partner was unaware of the project's status because Q.C.2 had done the majority of the work and Q.C.2 became frustrated, calling the other student names. As a result, Q.C.2 received both a failing grade and a lunch detention.

22. On or about September 27, 2024, Q.C.2 received a three (3) day out-of-school suspension due to fighting. However, another student instigated the fight by pushing Q.C.2 down the stair; Q.C.2 was only defending himself. It is unknown whether the other student was disciplined.

23. On or about October 20, 2024, Q.C.2 received an out-of-school suspension for fighting. A student had tripped Q.C.2 as he was leaving, while another student insulted him. Another student then ran out of the class, spit

on Q.C.2, and tackled him to the ground. A teacher intervened and sent Q.C.2 to the bus, where the security guard from the previous incident attempted to stop him and bring him to the office. Mrs. McCall then told the security guard to let Q.C.2 go and to not engage with him again.

24. On or about December 9, 2024, the school discussed switching Q.C.2's schedule due to severe bullying. The entire semester Q.C.2 had been called "retard", teased about being in special education, and physically harmed. Despite teachers being aware of these incidents, the school did not offer to change his schedule until the end of the semester.

25. On or about December 16, 2024, Q.C.2 received a referral due to the use of verbal threats during class. A student in Q.C.2's class had told him to "get back to work" while making whip sounds, stated that "when Trump becomes president, I'm going to own you", and that "you're going to be my slave again." This type of bullying and comments occurred on a daily basis. On this day, in response, Q.C.2 told the student to shut up, that he wanted to strangle him, and that he just wanted to be left alone. Q.C.2 was instructed to stay home for two (2) days. It's unknown whether the other students were disciplined.

26. On or about February 17, 2025, Q.C.2 received a referral due to escalation. Q.C.2 was still enduring relentless bullying. A student told him to stop "smacking his gum" and called him disrespectful to the teacher. Q.C.2 responded by telling her to shut up and flipped her off. The staff failed even to

attempt to de-escalate Q.C.2 or ask the student to stop antagonizing him. His teacher then sent Q.C.2 to the office, despite that the IEP states he is to go the library to calm down and that he has permission to chew gum, as an accommodation.

27. On or about March 24, 2025, Q.C.2 had a substitute teacher who sent him to the office. The school security guard came to escort Q.C.2. The school security guard then snatched Q.C.2's school-issued iPad away from him, while trying to get Q.C.2 to leave. Q.C.2 used some curse words, but then went to the hallway where he tried to retrieve his iPad from the security guard.

28. The School reported that Q.C.2 choked the security guard, who is now pressing criminal charges. A.T. is currently awaiting a call from the prosecutor's office about whether they plan to proceed with the charges.

29. The School suspended Q.C.2 for ten (10) days for his behavior and then held a manifestation determination meeting. At the manifestation determination meeting, the School determined that Q.C.2's behavior was a manifestation of his disability and agreed that it was a failure to implement the behavior plan as written. As a result, Q.C.2 returned to school after serving eight (8) days of his suspension.

30. The School did not revise the IEP or BIP. Neither was a Functional Behavior Assessment conducted.

31. On or about April 24, 2025, Q.C.2 received a referral due to an argument with another student. The student called Q.C.2 a "faggot" and then

proceeded to block him from sitting at his desk. The student initiated physical contact with Q.C.2 by shoving him, to which Q.C.2 responded by shoving back. It is unknown whether the other student was disciplined.

32.   On or about May 2, 2025, Q.C.2's teacher attempted to discipline him for leaving early to catch the bus despite the fact that Q.C.2 had been leaving at the same time for the entire school year in order to catch the special education bus. A.T. believes this was retaliation due Q.C.2's previous behaviors, including the incident with the security guard.

33.   On or about May 13, 2025, Q.C.2's previous suspension caused him to miss required assignments and ultimately led to the denial of his participation in all of the eighth-grade celebration events.

34.   Monroe's disparate treatment of Q.C.2 continues to harm him and his family and continues to cause them to suffer financially and emotionally.

## COUNT 1 – VIOLATION OF THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION

35.   Plaintiffs hereby replead and incorporate by reference paragraphs 1-34.

36.   Q.C.2 is an individual with a disability and was entitled to attend school at Monroe because he has legal settlement there.

37.   Monroe is an Indiana public school corporation that receives federal funding for educating students with special needs and other federal funds.

38. Monroe violated the Fourteenth Amendment by treating Q.C.2 differently than similarly situated nondisabled peers.

39. The Plaintiffs have been emotionally and financially harmed, and continue to incur loss due to Defendants' actions.

## COUNT II – VIOLATION OF 42 U.S.C. §1983

40. Plaintiffs hereby incorporate and replead paragraphs 1-39.

41. Monroe is a state actor and used its power to willfully, wantonly, and recklessly discriminate against the Family on the basis of Q.C.2's disability and race.

42. Monroe used its authority under state law to deprive Q.C.2 access to equal protection under applicable federal laws.

43. Monroe conspired against Plaintiffs to deprive them of equal protections under applicable federal laws.

44. Monroe's actions were a gross misjudgment and made in bad faith.

45. Monroe has a widespread pattern and practice of discriminating against disabled and minority students by not providing them with the same protections as other students or punishing them more frequently for similar behaviors.

46. Monroe's relevant policies and practices have had a disparate and disproportionate impact on disabled and minority students.

47. The Plaintiffs have been emotionally and financially harmed, and continue to incur loss due to Defendants' actions.

## COUNT III – VIOLATION OF AMERICANS WITH DISABILITIES ACT

48. Plaintiffs hereby incorporate and replead paragraphs 1-47.

49. Monroe discriminated against the Family on the basis of Q.C.2's disability.

50. Monroe is a state actor and receives federal funds for Q.C.2's benefit, including but not limited to funds under the Elementary and Secondary Schools Emergency Relief Funds, Title One, School Nutrition Funds, and funds under the IDEA.

51. Monroe's actions have prevented Q.C.2 from attending school, which is his constitutional right.

52. Monroe's actions and inactions created an environment that was severe and pervasive enough to deprive Q.C.2 of access to educational benefits.

53. As a result of the discrimination, Plaintiffs have been emotionally and financially harmed, and continue to incur loss due to the Defendants' actions.

## COUNT IV – VIOLATION OF SECTION 504

54. Plaintiffs hereby replead and incorporate by reference all allegations in paragraphs 1-53.

55. Q.C.2 is a qualified individual with a disability.

56. Monroe's actions prevented Q.C.2 from attending school, even though he had a constitutional right to do so.

57. Monroe's actions and inactions created an environment that was severe and pervasive enough to deprive Q.C.2 of access to educational benefits.

58. As a result of discrimination, Plaintiffs have been emotionally and financially harmed and continue to incur loss due to Defendants' actions.

### COUNT VI- RETALIATION

59. Plaintiffs hereby incorporate by reference and replead all allegations set forth in paragraphs 1-58.

60. Monroe retaliated against the Family for A.T. and Q.C.1's advocacy for Q.C.2.

61. As a result of Monroe's retaliation, Plaintiffs have suffered financial and emotional harm.

62. The Plaintiffs have been emotionally and financially harmed, and continue to incur loss due to Defendants' retaliation.

### COUNT VII- INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

63. Plaintiffs hereby incorporate by reference and replead all allegations set forth in paragraphs 1-62.

64. Monroe engaged in extreme and outrageous conduct that caused emotional distress to the Plaintiffs collectively.

65. Monroe's conduct was intentional or reckless.

66. The Plaintiffs have been emotionally and financially harmed, and continue to incur loss due to Defendants' intentional and/or reckless conduct.

### COUNT VIII- NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

67. Plaintiffs hereby incorporate by reference and replead all allegations set forth in paragraphs 1-66.

68. Monroe's actions were reckless, intentional, and negligent.

69. As a result of Monroe's actions, plaintiffs have collectively suffered emotional distress.

70. The Plaintiffs have been emotionally and financially harmed, and continue to incur loss due to Defendants' negligence.

### COUNT IX- NEGLIGENT SUPERVISION AND TRAINING

71. Plaintiffs hereby replead and incorporate by reference paragraphs 1-70.

72. Monroe had a duty to supervise and train teachers and staff working with Q.C.2 and they breached that duty.

73. Monroe had a duty to properly investigate allegations of wrongdoing and it breached that duty.

74. Monroe negligently supervised and trained the staff working with Q.C.2 and as a result of their failure to supervise staff, Plaintiffs suffered emotional and pecuniary damages and continue to suffer loss due to Defendant's actions.

### COUNT X- HOSTILE EDUCATIONAL ENVIRONMENT

75. Plaintiffs hereby replead and incorporate by reference paragraphs 1- 74.

76. Q.C.2 is a qualified individual with a disability.

77. Monroe receives federal funding to serve Q.C.2.

78. Plaintiffs suffered a hostile educational environment as a result of Q.C.2' disability.

79. Monroe's treatment of Plaintiffs, collectively, was so severe, pervasive, and offensive, that it denied Q.C.2 access to a free appropriate public education and created a hostile educational environment for him.

80. Monroe knew that A.T., Q.C. and their child, Q.C.2 were being harassed and treated differently and they were deliberately or recklessly indifferent to it.

81. Monroe had the authority to address the harassment and disparate treatment and chose not to or did so woefully inadequately.

82. As a result of the hostile educational environment, A.T., Q.C. and their child, Q.C.2 were deprived access to educational benefits to which other nondisabled peers had access.

83. As a result of the hostile educational environment, Plaintiffs have collectively suffered emotionally and financially, and continue to suffer due to Defendants' actions.

### COUNT XI- FAILURE TO ACCOMMODATE

84. Plaintiffs hereby replead and incorporate by reference paragraphs 1-83.

85. Q.C.2 is a qualified individual with a disability.

86. Monroe was aware of his disability.

87. Monroe failed to accommodate Q.C.2's disability.

88. Q.C.2's parent(s) met with Monroe a number of times to discuss and advocate for accommodations for Q.C.2.

89. Monroe did not allow Q.C.2's parent(s) to be meaningful participants in meetings regarding Q.C.2's accommodations.

90. As a result, Q.C.2's education plan was not properly developed or implemented and Q.C.2 suffered both discrimination and a hostile educational environment.

91. Q.C.2's teachers did not provide the accommodations that were appropriate for Student.

92. As a result, Plaintiffs have collectively suffered emotionally and financially, and continue to suffer due to Defendants' actions.

**COUNT XII- DISCRIMINATION ON THE BASIS OF ASSOCIATION**

93. Plaintiffs hereby incorporate and replead all allegations set forth in paragraphs 1-92.

94. Q.C.2 is a qualified individual with a disability.

95. Q.C.2 is eligible to attend school and has a right to a free appropriate public education.

96. Monroe receives federal funding to educate Q.C.2.

97. Q.C.2 did not receive a free appropriate public education.

98. Q.C.2 did not receive reasonable accommodations.

99. Q.C.2 suffered a hostile educational environment.

100. Q.C.2 suffered emotional distress.

101. Q.C.2's parent(s) advocated for Q.C.2 because Monroe was not serving him.

102. As a result of their advocacy, A.T. and Q.C. were treated differently and were denied access to the same benefits and services available to other families at Monroe.

103. Plaintiffs have collectively suffered emotionally and financially, and continue to suffer due to Defendants' discrimination and disparate treatment of them.

## COUNT XIII- FAILURE TO INVESTIGATE

104. Plaintiffs hereby replead and incorporate by reference paragraphs 1-103.

105. Q.C.2 was bullied, threatened, and harassed by staff at Monroe.

106. Q.C.2 and Q.C.2's parent(s) reported this disparate treatment to school officials.

107. School officials were either deliberately indifferent to these complaints or inadequately addressed them.

108. Monroe had a duty to investigate the claims of harassment against Q.C.2,

109. Monroe failed in that duty.

110. As a result of Monroe's failure to investigate the claims of disparate treatment, Plaintiffs, collectively suffered emotionally and financially, and continue to suffer due to Defendants' actions.

## **PRAYER FOR RELIEF**

111. Plaintiffs hereby incorporate by reference and replead all allegations set forth in paragraphs 1-110.

112. Plaintiffs were harmed as a result of Monroe's actions and seek to be made whole financially.

113. Plaintiffs seek financial damages in an amount to be determined at trial.

114. Plaintiffs are entitled to all damages, including but not limited to compensatory and punitive damages.

115. Plaintiffs request a trial by jury to hear their claims.

116. Plaintiffs' attorneys' fees should be reimbursed.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, Plaintiffs pray that this Court finds against Defendants and for all other relief deemed just.

Respectfully submitted,

        CURLIN & CLAY LAW ASSN. OF ATTYS.,

        /s/ Alexandra M. Curlin
       Alexandra M. Curlin  #24841-49
       Curlin & Clay Law
       8510 Evergreen Ave., Ste. 200
       Indianapolis, IN 46240
       amcurlin@curlinclaylaw.com